MASONITE CORPORATION *v.* DENNIS.

(Division A. June 8, 1936.)

[168 So. 613. No. 31440.]

**Harman Young,** of New Augusta, **C. C. Smith,** of Richton, and **Welch & Cooper,** of Laurel, for appellant.

Hathorn & Williams, of Poplarville, Currie & Currie, of Hattiesburg, and Jeff Collins, of Laurel, for appellee.

860

Argued orally by **Ellis B. Cooper**, for appellant, and by **C. V. Hathorn**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The appellee, George Dennis, Sr., brought an action at law against the Masonite Corporation, by which he sought to recover damages for the depreciation in the value of his land, alleging same to have been brought about by the fact that the appellant emptied the waste from its plant into Tallahala creek, which in turn emptied into Leaf river, and as a result of said effluent in the streams nauseous odors were produced, and a sediment was deposited on his land which injured its productivity. Appellee also alleged that the fish in the two

streams were killed, and that the waters of Leaf river were so polluted as to be unfit for human or animal use. Upon issue being joined and the trial of the case before a jury, there was a verdict for one thousand dollars, and a judgment of the lower court was entered accordingly; from which appellant prosecutes an appeal.

Sixteen assignments of error are presented to this court on behalf of appellant, each seriously and earnestly argued; but we shall consider only those which allege that the lower court erred in refusing to grant appellant the peremptory instruction requested by it.

The evidence as a whole did not meet the burden of proof, because it failed to show that the effluent discharged into Tallahala creek from the appellant's plant was the cause of appellee's damage. Addressing ourselves to this one question, and adverting to the oft-repeated principle of law that the burden of proof is cast upon the plaintiff to show by a preponderance of the evidence the liability of the defendant, we will not undertake to set out in full all the evidence, but only a résumé, with all the legitimate inferences to be drawn therefrom.

Some time prior to 1927, the Masonite Corporation began manufacturing in the city of Laurel a building material called "Masonite board." Its plant was upon the banks of Tallahala creek, or very near thereto. The process of manufacturing this product is fully described in the case of Masonite Corporation v. Hill, 170 Miss. 158, 154 So. 295, 95 A. L. R. 157.

Evidently the appellee recovered in this case on the theory that because of the existence of large quantities of wood fiber discharged with the water from appellant's plant in Laurel into Tallahala creek, which in turn flowed into Leaf river and traveled forty or fifty miles to his land, where, at times, the wood fiber in the water destroyed fish, created nauseous odors, and caused a sediment to be deposited in low places on said land, killing the grass. Tallahala creek is a stream about

thirty-five or forty feet wide, and not very deep. Leaf river, so far as all the locations involved in this case are concerned, is about two hundred feet wide and from fifteen to forty-five feet deep.

There is no evidence in the case at bar that the wood fiber had decomposed. The fiber discharged into the stream mingled with the effluent from other manufacturing plants in the city of Laurel, the sewage from the city of Ellisville, and also from the Ellisville State School, all of which contributed to the destruction of animal life in the creek, not because of any artificial chemical substance, but because of the density of the mixture which excluded oxygen from animal life in the stream.

Dennis claimed to be the owner of one hundred eighty-nine acres of land on Leaf river, situated some miles below the point of confluence of Tallahala creek and Leaf river. Appellee is a riparian owner, having more than two miles of frontage on the river due to the bends therein. Forty acres of his land was in cultivation; the balance was swamp and ''hammock'' land. Appellant's plant was about fifty miles upstream from appellee's land.

According to the map, Tallahala creek rises many miles north of Laurel. Leaf river flows in a southeasterly direction past the city of Hattiesburg, many miles north of the point where Tallahala creek empties into it; after this junction the river flows south for miles, where, by conjunction with another river, the Pascagoula river is formed, and it, in turn, empties into the Gulf of Mexico.

The evidence shows beyond dispute that the appellant discharges a million or more gallons of water and wood fiber into the creek daily, and that it had operated for the seven years preceding this suit in 1934 with fair and usual regularity. There were slight traces of chemicals, such as tannic acid, soda, and other caustics mingled with the wood fiber in the water, but they were so infinitesimal as compared to the immense volume of

water discharged as to demonstrate to a certainty that they could not have destroyed animal life in the streams involved. The court below so instructed the jury.

The evidence of appellee and his witnesses tended to show that beginning within a few miles of appellant's plant floods or freshets had occurred four times since 1927, at which times dead fish were deposited on the land near the banks of the creek at various points, and also along the banks of Leaf river below the mouth of Tallahala creek; that, on these occasions, a sediment was deposited in the lands near the streams causing. an offensive odor, but that it cleared away within a short time.

Appellee purchased his land in June, 1932. He refers to an occasion when there were odors emanating from the river in September, 1932, to which other witnesses do not seem to refer. Most of the evidence was directed to July 3 and 4, 1933, when dead fish in large numbers were cast on the land along the banks of the river, and a sediment was deposited by the overflow on the low places of appellee's uncultivated swamp lands. Appellee testified that one-third of his land was thus injured by the sediment, but when asked to make round marks on a map showing where such matter was deposited, he marked only six places, which covered but a small portion of the one hundred eighty-nine acres of land of which he was in possession and claimed to be the owner. He had no house upon the land, and testified that the uncultivated land was especially adapted to pasturage but that by reason of the sediment grass was killed in some spots. He also testified that the waters of the river were black during the overflow and the deposit on his land was like "black mud." He had paid one hundred dollars for the land, which was assessed at about six hundred dollars; the usual rate of assessment in that county was sixty per cent. of its value. He claims that by taking the difference between the value of his land without the pollution in the river and with it there-

in, he was damaged from one thousand eight hundred dollars to two thousand three hundred dollars. He testified that the sediment was wood fiber, but made no explanation as to how he knew that; neither was there any showing as to how long the land covered by it would be without grass.

The evidence tended to show that these unusual conditions occurred only when there were floods, and they disappeared, so far as Leaf river was concerned, when the water receded. Appellee stated that one could hardly detect the odor in normal times. The evidence further tended to show that there were manufacturing plants in the city of Hattiesburg which emptied effluent into Leaf river, and, as is usual with all such streams in Mississippi, there were other tributaries emptying into the river.

Eight witnesses testified that in the city of Hattiesburg on July 3 and 4, 1933, there was an oily scum on the waters of Leaf river, and that they saw dead fish floating in the stream. Two or three witnesses were offered in rebuttal who testified that they were about the river on those days but did not notice any dead fish or scum thereon.

· We have a record here which discloses that four times within a period of seven years this strange phenomenon of dead fish, odors, and deposits of sediment occurred in Leaf river and Tallahala creek. Appellee's land is situated between Wingate bridge on Leaf river and the mouth of Tallahala creek. He offered two game wardens who on the 4th of July, 1933, made an investigation of the river to determine the cause of the dead fish; they started from McLain, Miss., far south of appellee's land, and proceeded toward Wingate bridge. They testified that they found dead fish in quantities in Leaf river until they reached Wingate bridge, but from there to the mouth of Tallahala creek they saw none, and thence they proceeded to Mahned bridge, which is on Leaf river north of the mouth of the creek. One of the

witnesses said that on examining a few of the dead fish he found a "furze" in their mouths.

The undisputed testimony of an expert chemist was to the effect that the effluent from the appellant's plant at Laurel would destroy animal life in Tallahala creek only when it was joined with the effluent discharged by other agencies at Laurel. He also stated that as the effluent from these agencies traveled in the stream the density thereof soon disintegrated and was no longer destructive.

We do not take into consideration the testimony of the bacteriologists and the chemist as to the condition of the waters in Leaf river below the mouth of Tallahala creek, and in Leaf river north of the creek, which was to the effect that the waters in the river below the mouth of the creek had less impurity and pollution than was found in water taken from the river above the mouth of the creek. We leave this testimony out of consideration because the witness who took the water to Dr. Hand, the state chemist, was impeached by appellee's witnesses as being unworthy of belief.

The fact is that there is very little dispute in the evidence in this case. What we have stated is the material facts with the fair inferences to be drawn therefrom. Many witnesses testified that they saw no black water and no dead fish and noticed no offensive odors along Tallahala creek and Leaf river until after the Masonite Corporation began its operations.

It is the rule in Mississippi that everything must be considered as proved which the evidence establishes directly or by reasonable inference against the party who asks a peremptory instruction. Dean v. Brannon, 139 Miss. 312, 104 So. 173; McKinnon v. Braddock, 139 Miss. 424, 104 So. 154; Wise v. Peugh, 140 Miss. 479, 106 So. 81; St. Louis & S. F. R. Co. v. Nixon & Phillips, 141 Miss. 677, 105 So. 478; Gulf & S. I. R. Co. v. Hales, 140 Miss. 829, 105 So. 458. It is also the rule in Mississippi that a presumption may not be based upon another presump-

tion, Hinman v. Sabin, 147 Miss. 509, 112 So. 871, and verdicts cannot be allowed to stand which are based upon mere conjecture, or upon an inference, except where reasonable necessity in the interest of justice requires. We take judicial notice of the fact that rivers and creeks in Mississippi have much foreign matter deposited in them—logs, trees, limbs, leaves, and in the cities all the solid matter which floats on the streets, such as paper and other sewage.

In this case there is only a lively suspicion that on these four occasions the conditions described by appellee had their source in the wood fiber discharged in the effluent from the Masonite plant, but it cannot amount to more than that. When the game wardens examined Leaf river from McLain to Hattiesburg and found no dead fish above Wingate bridge, near the mouth of Tallahala creek, there is a hiatus in the evidence. The fact that these occurrences were only four in number in seven years is wholly unexplained by any witness or any theory advanced in this case, where the proof shows without contradiction that more than a million gallons of water mixed with wood fiber was emptied by appellant's plant into Tallahala creek daily. It is hardly conceivable that the water reached flood stage only four times from 1927 to 1934.

So far as dead fish are concerned, it is a violation of the law in Mississippi to destroy fish with dynamite, lime, and chemicals, yet there are men with so little regard for the value of fish life to the people of the state that they engage in this nefarious practice. The fact that an oily scum and dead fish were on the water at Hattiesburg in July, 1933, was not denied, yet at Runnelstown, on the creek but several miles north of the mouth thereof, some twenty-five fish were caught the day before this case was tried, some of which weighed from two to three pounds, showing that ordinarily and generally fish life, a short distance downstream from

the appellant's plant, is not destroyed by the effluent therefrom.

We called attention above to the undisputed evidence of the chemist that the density of the combined mixture destroyed animal life in the streams. When Tallahala creek and Leaf river are at flood stage, the volume of water in both is enhanced to the extent of the rise of the water in each. These facts make the phenomenon complained of more mysterious so far as its record is concerned. It occurs to us that if an examination of Tallahala creek and Leaf river had been made near the locations involved, and decaying wood fiber had been found in pockets or holes in these streams, then appellee might have argued that a freshet or flood would sweep out these holes and mingle the decayed matter with the water, and thereby create a condition destructive of fish life and grass, and which would also cause the offensive odors. However, this record is barren of any evidence of this character. There is no evidence tending to show that quantities of effluent emanating from appellant's plant did not continually flow into Tallahala creek.

This is not a case brought by the riparian owner of land along the banks of Tallahala creek near the confluence of effluvia arising from all the sources in the city of Laurel, but is a case where the scene is far removed from those activities. As said in the Hill Case, supra, we know that polluted water will purify itself within a reasonably short distance. It did not devolve upon appellant to ascertain for appellee what caused the fish to die, what caused the odor, or the black mud deposited on his land. A fair conclusion from appellee's own testimony, about his own case, seems to be that the occurrences of July, 1933, are unexplained, unusual, and unprecedented so far as Leaf river is concerned. It is just as reasonable to suppose the stream accumulated its own substance which caused the water to turn black and have an offensive odor. It is wholly unexplained as to

why the waters were black only on these few occasions, and yet an analysis, or even an examination, of the water at that time would probably have revealed the cause therefor.

We conclude, therefore, that appellee's case is based upon mere speculation, is entirely unproved, and we cannot say that appellant should be held for damages, however much we might desire to see one who pollutes a stream without authority of law held for such. There is too great a distance here and no evidence whatever tracing the effect to the cause, except by an unfair and unjust inference which we cannot invoke.

The peremptory instruction requested by appellant should have been granted.

Reversed and dismissed.