WESTERN GEOPHYSICAL COMPANY OF AMERICA v. MARTIN

No. 43515 May 3, 1965 174 So. 2d 706

*W. Vol Jones,* Waynesboro; *George P. Hewes, III, Brunini, Everett, Grantham & Quin,* Jackson, for appellant.

*Stanford Young,* Waynesboro, for appellee.

BRADY, TOM P., J.

This is an appeal from the Circuit Court of Wayne County, wherein the appellee brought suit against the appellant for damages for the alleged pollution of his water well, caused by the negligence of the appellant. From an adverse judgment, the Western Geophysical Company of America appeals. Stated briefly, the pertinent facts are as follows:

The Western Geophysical Company of America, hereinafter called Western, is engaged in seismograph work, the main purpose of which is to locate subsurface for-

mations capable of producing oil. This work involved the detonating of small charges of dynamite in relatively shallow holes, thereby sending out energy waves which in turn bounced off the lower formations and traveled back to the surface where they were detected and recorded by extremely sensitive instruments.

Appellee charged that on May 6, 1963, around three o'clock in the afternoon, the appellant detonated a charge of dynamite close to the appellee's property and a water well of the appelle, so that the appellee's water well, which had been operating properly, ceased to do so and began to pump sand, which ruined the pump. More specifically, the appellee charged Western's wrongful act was "the firing of dynamite in the water stream that your plaintiff's water well was in and the firing of dynamite or other explosives too close to the plaintiff's house and water well." Appellee further charged that the vibration damaged the strainer, causing the pump to pump sand and rusty water, and that the sand burned up the pump. The appellee contended that the explosion was the proximate cause of the loss of his well and that he sustained actual and punitive damages in the sum of $2,500.

The appellant denied the negligence or that it caused the appellee's damage. The jury brought in a verdict for $1,000. Appellant made a motion at the conclusion of appellee's testimony for a directed verdict, which was overruled. At the conclusion of appellant's testimony, appellant made a motion for a peremptory instruction, which was also overruled. The overruling of these motions is assigned as error by the appellant, who also urges that the verdict of the jury is contrary to the law and the overwhelming weight of the evidence.

Other errors are assigned by the appellant, among which are, that the verdict is so grossly excessive as to evince bias, passion and prejudice, the refusing of the trial court to grant certain instructions requested

by the appellant and the granting of certain instructions requested by the appellee, the sustaining of objections of the appellee to evidence offered by appellant, and to questions propounded to witnesses upon the trial of the cause below on behalf of the appellant. The record discloses that five witnesses testified in behalf of the appellee; that the testimony of four of them was by the appellee, his wife, his father-in-law, and a tenant who lives on appellee's place. The fifth witness testifying for the appellee was a Mr. Burl Smith, who was a former employee of Western. Mr. Smith merely testified to the fact that Western shot in the area and that shortly thereafter he was called to the appellee's house for the purpose of inspecting his well, and that he did inspect the well and found that it was making red, rusty water. The record does not disclose that Mr. Smith knew or could have known when the well first began to make red, rusty water, and the testimony of Mr. Smith is insufficient to fix liability for any damage which occurred to the well.

The testimony of the appellee, his wife, his father-in-law and his tenant was much the same, namely, that the well was furnishing an ample supply of pure water for six years prior to the explosion, and just before the explosion, but that promptly thereafter the water was red, sandy, and unfit for human consumption.

The record is undisputed that a fifteen pound charge of dynamite was detonated at a depth of fifty-five feet, a distance of eight hundred feet from the well of the appellee. This shot did not occur on appellee's land but occurred on adjacent land, where permission to detonate had been obtained. On this adjacent land there was a water well which was not affected. In spite of the appellant's attempts, the court would not permit appellant's witnesses to testify specifically with reference to this well, which was located only six hundred feet from the explosion and which obviously was not injured.

It is undisputed that appellee's well is one hundred and eighty feet deep. The testimony of appellant's geologist, that the water sand supplying appellee's well dipped to the south or southwest, is undisputed. It is also undisputed that the explosion was south of the well and not in the path of the movement of water thereto. It is uncontradicted that the explosion was not in the water sand, but in the strata above the water sand, and that it took place at a depth of fifty-five feet. It is undisputed that the well was bottomed near the base of the water sand, a vertical distance of one hundred and fifteen feet below the explosion.

Likewise, it is undisputed that, approximately five days subsequent to the explosion, the appellee drilled another well to the same depth, and located this well only ten feet from the well which he claims was damaged. It is undisputed that this second well produces good water, and abundantly.

The proof shows that the alleged damage to the strainer claimed by the appellee was merely an assumption, for the reason that the strainer had never been pulled and was still in the ground. The appellee himself admitted that he did not know of his own personal knowledge the effect of a charge of dynamite on the subsurface formations in the earth. The appellee stated he did not know of his own personal knowledge that the shooting caused the damage to his well; that he assumed that this was so.

It is undisputed that only two shots were fired, AB 545 and AB 547; that AB 547 was the closest, and was located eight hundred feet from the well in question. The hole which was bored for the explosion was four inches in diameter. The appellee admitted that he did not know whether the strainer was all right or not, because it was still down in the ground; that he assumed that something was damaged down there; that he knew the sand was coming from somewhere.

The record fails to disclose that the appellee made any effort to find out the cause of his trouble. He merely assumed that, because Western had fired a shot somewhere behind his house and his well had gone bad, the shot was the proximate cause of his well damage.

Appellee proved that the cost of drilling the new well was $458.36. He and his wife testified as to the inconvenience they suffered because they had to carry water as a result of the loss of the water well. He testified also that he had to move his pump house and that his wife had to carry the clothes to a washerteria located some distance from her home and also take care of young children at the same time.

In contrast to this testimony of the appellee, the appellant put on members of the crew who were operating in the vicinity of appellee's land, who testified with reference to their operations. Mr. Lawrence Hollier, superintendent of the crew, who had participated in 25,000 detonations, testified that the company has a policy never to fire shots closer than six hundred feet to a well or residence; that this distance is always maintained, not because there is any fear of damage but because this distance seems to satisfy most landowners and reduces the number of claims.

Mr. Burl Smith, a survey helper and permit man, and a former employee, testified that he obtained permission from all persons upon whose property they went and shot. Mr. Smith testified that the closest shot actually fired was AB 547, at a distance of eight hundred feet from appellee's well.

Mr. McGee, who actually fired the charge, testified that part of his job was to note certain information relative to each shot, which was recorded on the ''jacket'' or container for a magnetic tape, which automatically recorded vibrations from the shots. The information recorded by Mr. McGee, and the data concerning the explosions, indicate that both of these shots were not fired

on May 6 but on April 29, 1963. The charge of dynamite used in each was fifteen pounds. The charge in AB 545 was detonated at a depth of sixty-five feet, and the charge in AB 547 was detonated fifty-five feet from the surface, although the hole was drilled to a total depth of seventy feet. Mr. McGee also testified that these were the only shots fired in the vicinity of appellee's well, and that no shots were fired in that vicinity on May 6, 1963.

Mr. Henry Toler, a consulting geologist with over thirty years' experience in the state of Mississippi, who was employed for six years by the State Oil and Gas Board, two of which years he served as the State Oil and Gas Supervisor and chief geologist, testified that he was familiar with the area involved in the lawsuit; that he had made a personal on-the-ground inspection of the area and that he had compared the cross-section map or plat showing the surface of the ground and the subsurface formations of the area in question, down to a depth of approximately eight hundred feet. This plat is identified as "Exhibit One" to Mr. Toler's testimony.

Mr. Toler testified as reflected on the map, that Western's shot AB 547 was located in the Catahoula formation. The bottom of this shot point hole is about thirty to thirty-five feet from the base of the Catahoula formation, the total depth of said formation being approximately one hundred feet at this point. The plat also shows that appellee's well is bottomed in the Catahoula water sands near the base. Mr. Toler showed where the outcroppings of the sand occurred and marked on the map an "X" to designate the outcrop. This witness testified that the movement of water through the Catahoula water sand is to the south or southwest. In other words, the dip or slope of the water sand is to the south or southwest and, in effect, the water is flowing downhill to the south or southwest. It is undisputed

that Western's closest shot was south and west of appellee's well; thus it was not in the way of the flow of water to the sand in which the well was bottomed. It was on the other side or dip down from the well. As this witness testified, the shot was not in the path, and not even in the water sand through which the water is flowing. It was the opinion of this witness that the shot point could not possibly have interferred with the flow of water to the well.

Mr. Dan Herlihy, a geophysicist with Delta Exploration Company, who has had extensive experience in all phases of seismograph work for a period of seventeen years, when asked the hypothetical question whether or not the charge could have damaged the well, testified as follows: "I don't think it would do any damage at all; I am sure it wouldn't." He further testified that the length of the energy wave created by the explosion would be such that, if there was any displacement or movement of the earth, it would be as a unit so there would be no abrupt, shattering effect.

Appellant attempted to introduce a table prepared by the Bureau of Mines of the United States Department of the Interior showing the displacement of the earth at a given distance, resulting from the explosion of a charge of dynamite of a known size. This was not permitted by the trial court. Outside of the jury's presence, Mr. Herlihy referred to the table and stated that the displacement of the earth from a fifteen pound charge at eight hundred feet is 14/10,000 of an inch; that the energy wave which is produced by the explosion has to be amplified to the order of 100,000 times to be of any value to the geophysicist and in order that it may be recorded on the sensitive machines.

Mr. Joseph W. Lang, Mississippi Director of Water Resources Division of the United States Geological Survey, who for the past thirty years has been engaged in work relating to the evaluation and development of

adequate sources of water and who has spent the last eleven years in Mississippi, testified that his work has consisted of making surveys and evaluating underwater supplies in this state. He, too, confirmed the fact that the water sands dipped generally in a southerly or southwesterly direction in this area of the county. Mr. Lang further testified that he was familiar with the seismograph operations and told of experiments his division had conducted in Lamar County in connection with the Tatum Salt Dome. There Mr. Lang had a water well drilled to a depth of forty feet within one thousand feet of two shot points. A recording device was placed in the well which was designated to detect and record the slightest movement. A float or cork was placed in the water and connected to a very sensitive needle which would record on a graph any movement of the float. There were two shot holes, each containing four hundred pounds of dynamite, each between one hundred and two hundred feet deep, and each approximately one thousand feet from the well. They were both exploded, and Mr. Lang was asked what effect, if any, these shots had on the well. The answer was: ''Well, it was so small it would not even record, make a record on the chart.''

Mr. Lang was further asked if they checked the effects of the two four hundred pound charges on domestic wells in the area, and he replied that they found no effects at all. Mr. Lang, in response to the hypothetical question given him as to whether or not the shot eight hundred feet from appellee's well with the designated amount of explosives would damage the well, stated: ''No, there would be no possible way for this to damage the well I can see because you are shooting in a formation above the water bearing formation, and actually there is no connection there hydrologically.''

Mr. Lang further testified that charges had been fired by the Atomic Energy Commission with which he was familiar; that four or five tests in other sections of

the state had been made to determine the effects of large explosives on water wells; that these were large charges on the order of five hundred pounds each. The nearest well tested was approximately three-fourths of one mile from the charge. In each instance the result was the same, the wells were not affected.

Thus the proof of appellant shows first, by the testimony of Mr. Hollier, that the shooting in the vicinity of the appellee's home was that which was customarily adopted and used and that there was no negligence involved and no possible harm could have come to the appellee's well in detonating the fifteen pound charge, eight hundred feet from his well, at the height in the ground above the water sand. Mr. Herlihy and Mr. Hollier both testified it is customary throughout the industry to stay six hundred feet from water wells, although shooting could be done much closer without danger of injury. Mr. Toler, Mr. Herlihy and Mr. Lang, all men of experience, were of the opinion that a fifteen pound charge would not harm a well eight hundred feet distant. No proof was offered by appellee to contradict this testimony. There was no proof showing negligence or that Western reasonably should have foreseen that harm would result to the appellee's well by the setting off of the charges where and as it did.

Assuming, however, that there was no requirement on the part of appellee to prove negligence, still the appellee is faced with the problem of showing that there is causal connection between his alleged injury and any act of Western, assuming it was negligent. The appellee's proof in this regard is wanting. Appellee's case is based upon the relative coincidence of the two events, the shot being fired and the malfunctioning of his well. There was no direct proof on the part of the appellee linking these two events. It follows, therefore, that appellee is asking this Court to take judicial knowledge of the fact that Western's shot damaged his well. This is

asked in spite of the fact that appellee failed to prove that the shot was set off in the water stream in which the well was bottomed. The proof was undisputed that this was not the case; that the shot was actually fired in the formation above the water sand, and the bottom of the shot hole was actually one hundred and fifteen feet above the bottom of the well. This judicial conclusion is also urged in spite of the fact that appellee failed to prove that the strainer had been damaged or injured by the vibrations from the shot. The proof is that the strainer was never removed and is still in the ground, and it is still not known whether or not the strainer was damaged. As stated, the appellee did not know what caused the damage to his well but merely assumed that it was the seismograph shot.

The case at bar is controlled by the principles announced in the following cases: Magnolia Petroleum Co. v. Williams, 222 Miss. 538, 76 So. 2d 365 (1954); Tombigbee Elec. Power Ass'n v. Gandy, 216 Miss. 444, 62 So. 2d 567 (1953); Magnolia Petroleum Co. v. McCollum, 211 Miss. 166, 51 So. 2d 217 (1951); Humble Oil & Ref. Co. v. Pittman, 210 Miss. 314, 49 So. 2d 408 (1950) General Geophysical Co. v. Brown, 205 Miss. 189, 38 So. 2d 703 (1949); Blizzard v. Fitzsimmons, 193 Miss. 484, 10 So. 2d 343 (1942); Kramer Service, Inc. v. Wilkins, 184 Miss. 483, 186 So. 625 (1939); McCain v. Wade, 181 Miss. 664, 180 So. 748 (1938); Masonite Corp. v. Dennis, 175 Miss. 855, 168 So. 613 (1936).

There are several reasons why the verdict in the court below cannot stand, but we will discuss only a few fundamental reasons why this is so. The first reason is that the appellee did not meet the required burden of proof in that he failed to show a causal connection between the explosion and the damage.

Appellee cites five cases in his brief in support of his contention that he has met the burden of proof and has shown that the negligence of the appellant was the

cause of the damage and injury to his well. Three of these cases which deal with damages to a water well purporting to have been caused by seismograph explosions have been decided by this Court. In two of these cases, General Geophysical Co. v. Brown, and Magnolia Petroleum Co. v. McCollum, recovery was allowed. Appellee urges these two cases as authority for permitting the verdict in the case at bar to stand. A careful reading of these two cases, however, establishes the fact that they are easily distinguishable from the facts in the case at bar.

In the Brown case the company was a trespasser but, aside from that, the plaintiff offered sufficient evidence to show a causal connection between the acts of the defendant and the injury complained of by the plaintiff. In the Brown case the plaintiff was unable to obtain adequate water from a new well which he was forced to drill because of the inadequate water situation produced in the old well by the shooting of the company. In the Brown case a well driller with twenty-nine years experience testified that in his opinion the seismograph activity had impaired the quality and quantity of water sources in the area of plaintiff Brown's home. This testimony was somewhat expert in character and it was of such quality that the jury had reasonable grounds upon which to conclude that the testimony of this experienced well driller was accurate and credible. There is no such testimony offered in the case at bar. Furthermore, the testimony in the case at bar shows that the new well which the appellee drilled, located within ten feet of the old well, and drilled to approximately the same depth, was performing satisfactorily from the same water sands. The proof in the Brown case showed that prior to the explosions no difficulty was had in that area in obtaining an adequate supply of good water, but that since the explosion there had been difficulty encountered in finding sufficient water. The testimony in

the Brown case goes beyond that of mere conjecture or supposition. It was testimony based on actual facts obtained from drilling operations, which the well driller gave. His testimony was not based on coincidence, supposition or conjecture, but on actual results he had obtained.

In the McCollum case we find the proof to be much the same as that which was offered in the Brown case. Following the damage to the first well, McCollum had another well drilled also in close proximity to the first. However, unlike the appellee's well here, Mr. McCollum's second well did not furnish an adequate supply of pure water. In the McCollum case the new well failed to produce the same kind of abundant clear water as the old well had provided prior to the dynamite explosion. The water in the new well at times presented a milky appearance and only a few buckets of water could be drawn from the new well at any one time. In the McCollum case testimony was offered by an experienced water well driller, that the seismic charge concerned was the cause of the damages. A Mr. Leon Bryant drilled the new well for Mr. McCollum and he stated that it was his opinion that the concussion caused by the explosion of the twenty pound charge of dynamite caused the well curbing in the old well to give way. He expressly designated the damage.

In the case at bar there is not any specific, competent testimony as to how and in what manner the well was damaged by the appellant's detonation. In fact, there is no testimony on this point except by the appellee himself, who admitted that he did not know what damage was caused; that he just assumed damage was caused.

■■ ■ The law is well settled that in tort actions the burden is upon the plaintiff to prove with reasonable definiteness that the party charged with the wrong be the party responsible for the wrong. This was said by this Court in Magnolia Petroleum Co. v. Williams, *supra,*

wherein we stated that the plaintiff in tort actions must prove with reasonable definiteness that the party charged with a wrong be the party responsible for the wrong, citing therein the case of McCain v. Wade, 181 Miss. 664, 180 So. 748 (1938), wherein we said as follows:

". . . But in this class of cases, as in other actions in tort, the plaintiff must show with fair or reasonable certainty or definiteness that the party charged is the party actually responsible for the wrong. It is not enough that this shall be left to conjecture or to inferences so loose as that it cannot be dependably told where conjecture ceases and cogent inference begins.

"We have repeatedly read this record through and through, and from what we can see, all that the jury could have done would have been to make an unsafe guess as to whether the fire that burned the hay had its origin in one set out by defendant's husband and agent, or whether from fires set by one Wortham or his co-workers not in the employ of defendant — so far as any real proof is concerned — or whether from other sources, it being shown that fires were at several points in that immediate vicinity. As we have already indicated, the evidence is obscure in cogency and in probative detail. And thus, had the jury made the guess that the fire had its origin in the one set out by defendant's husband, it would not have had the support of that substantial character of definite evidence which is necessary to maintain the affirmative of an issue, such as here involved, which, as we have said, is required to be proved with a reasonable degree of certainty."

The refusal of this Court to sanction verdicts based on assumption, conjecture or surmise was also pointed out in Humble Oil & Refining Company v. Pittman, *supra*. The similarities between the Pittman case and the case at bar are singular. In both cases the water

sand dipped to the southwest and in both cases the shot point was south of the well, the significance being that the shot was not detonated in the path of the movement of water to the plaintiff's well. In both cases the water well was located near the base of the water sand at a considerable distance below the depth of the shot. In the Pittman case this distance was one hundred and thirty-nine feet, and in the case at bar it is one hundred and fifteen feet. In the Pittman case the ground distance between the shot point and the well was nine hundred feet, which is one hundred feet farther than in the case at bar. In the Pittman case there were three charges detonated, two charges of two pounds each, and one of two and a half pounds of dynamite. In the case at bar one charge of fifteen pounds of dynamite was detonated. The proof in the Pittman case and in the case at bar is similar except that the plaintiff's proof in the Pittman case is somewhat stronger. In addition to the plaintiff and his well driller, a Mr. Crosby testified that, in his opinion, an explosion two hundred to three hundred yards from a water well would "affect" it. There is no such testimony in the case at bar. The testimony of the geologist in the Pittman case is quite comparable to the testimony of witness Toler in the case at bar. The geologist in the Pittman case testified that "a subterranean explosion would not disturb the sand nor render it ineffective as a conduit with the flow or infiltration of water. The bottom of the lowest hole is at substantial elevation above the top of the sand stratum, and the bottom of the well hole is near the base of the sand." The testimony of the witness Alford in the Pittman case is likewise similar to the testimony of the witness Herlihy in the case at bar. Both testified from long experience with the use of explosives, that a charge of the size involved in each case would not damage the well in question. In both cases proof was offered of the negligible displacement of the

earth from the size charges involved. In the case at bar this proof was not allowed in the jury's presence. The language of the court in the Pittman case deserves our attention. In that case it was said:

Against this expert testimony there is left only the circumstance that soon after the charges were fired some disturbance of the well appeared. This may of course had had a causal connection with the explosions. There is plausible ground for lay witnesses so to suspect. Yet verdicts may not rest upon suspicion or conjecture. In its last analysis the circumstantial evidence adduced to support the verdict is the theory post hoc ergo propter hoc. This basis has never of itself been held substantial enough upon which to erect proximate causation. (Citing Kramer Service Co. v. Wilkins, 184 Miss. 483, 186 So. 625, 627 (1939).)

The Pittman case relied upon the Wilkins case, in which the court, speaking through Justice Griffith, said:

There is one heresy in the judicial forum which appears to be Hydra-headed, and although cut off again and again, has the characteristic of an endless removal. That heresy is that proof that a past event possibly happened, or that a certain result was possibly caused by a past event, is sufficient in probative force to take the question to a jury. Such was never the law in this state, and we are in accord with almost all of the other common-law states. Nearly a half century ago, when our Court stood forth in point of ability never excelled, and when the principles of the jurisprudence of this State were being put into a more definite form than ever before, Chief Justice Campbell said in Railroad v. Cathey, 70 Miss. 332, 337, 12 So. 253: "It is not enough that negligence of the employer and injury to the employee coexisted, but the injury must have been caused by the negligence. . . . 'Post hoc ergo propter hoc' is not sound as evidence or argument. Nor is it sufficient for a plaintiff

seeking recovery for alleged negligence by an employer towards an employee to show a possibility that the injury complained of was caused by negligence. Possibilities will not sustain a verdict. It must have a better foundation."

This terse and expressive language had no such limited application as that it governed only in employer and employee cases, but is to be paraphrased as follows: It is not enough that negligence of one person and injury to another coexisted, but the injury must have been caused by the negligence. Post hoc ergo propter hoc is not sound as evidence or argument. Nor is it sufficient for a plaintiff, seeking recovery for alleged negligence by another toward the plaintiff, to show a possibility that the injury complained of was caused by negligence. Possibilities will not sustain a verdict. It must have a better foundation. (184 Miss. at 496, 497.)

■■■ Viewing the testimony of the appellee objectively, we are forced to conclude that the best which can be said for the testimony is that it was possible the well damage could have resulted from a seismograph charge, but this Court has held on numerous occasions that the possibility a cause will produce a certain result is no substantial testimony at all. Mutual Ben. Health & Acc. Ass'n v. Johnson, 186 So. 297 (Miss. 1939); Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938); Berryhill v. Nichols, 171 Miss. 769, 158 So. 470 (1935).

It is inescapable that appellee's case is predicated upon the relative coincidence of the two events, the shot being fired and the malfunctioning of the well, plus the assumption or inference that the former caused the latter. This inference is unnecessary because if the shot did cause the damage the appellee could have offered more direct proof thereof by a water well driller, and there are a great many in this state, by some employee or agent of the Oil and Gas Board, or by an explosive

expert, as was done in the Brown and McCollum cases. This elementary requirement was pointed out in Masonite Corporation v. Hill, 170 Miss. 158, 154 So. 295 (1934). The proof in this case, however, establishes the fact that the inference made by the appellee is not a safe and dependable probability. The proof is directly to the contrary, that the shot could not have damaged the well. Appellant's witness, Mr. Toler, further demonstrated the weakness of appellee's case when he pointed out that there were several other possibilities of the damage. Witness Toler stated that a ''screen failure'' is not at all uncommon in a water well. Another possibility is that the casing could have collapsed. Mr. Herlihy said the pump on the well would jar it far more than the shot. Appellee himself admitted that it was entirely possible that after six years the pipe could have been rusted and the rust fallen down into the well. The inexorable fact nevertheless remains, that there are other factors which could have caused or contributed to the trouble with the appellee's well. No effort was made on the part of the appellee to rule out any of them, just as no effort was made to directly link the malfunctioning of the well to the appellant's detonation.

We stated in the Williams case:

The law requires that the plaintiff in tort actions prove with reasonable definiteness that the party charged with a wrong be the party responsible for the wrong. . . . (222 Miss. at 542.)

In the Williams case the plaintiff failed to show that the formation in which his well bottom was connected with the formation into which salt water seeped from the defendant's disposal pit. Under those circumstances it was impossible for the court to determine from which pit salt water was seeping into plaintiff's well.

In the case at bar the proof is that the same water sands were utilized by the new well which the appellee drilled and therefore the explosion did not disturb or

alter these water sands since the new well was located only ten feet distant from the location of the old well and at approximately the same depth.

 ██ ██ It follows therefore that the appellee failed to meet the burden of proving that the damages complained of were proximately caused by the appellant's operation, and therefore the appellant's motion to exclude the testimony, and for a directed verdict, should have been sustained. Moreover, this case transcends this apothegm for the reason that the testimony and the unchallenged proof in this cause establishes beyond peradventure, and by a preponderance of the evidence, that the damage could not have been caused as alleged by the appellee in his declaration. Therefore, the court also erred in refusing to grant the appellant's request for a peremptory instruction. In general, see 36 Am. Jur. *Mines and Minerals* sec. 183 (1941). See also 109 A.L.R. 395 (1937); 92 A.L.R. 741 (1934); 55 A.L.R. 1385 (1928).

It is unnecessary for us to consider either the instructions which appellant urges were improperly refused, or the denying of the appellant the right to introduce certain competent testimony.

 ██ In conclusion, this Court can neither ignore the time-honored maxim that a party seeking redress must show a causal connection between the wrongful act of the accused and the injury alleged to have been sustained, ██ nor accept as proof the assumption *post hoc ergo propter hoc* made by the appellee which hypothesis was completely eliminated and contradicted by the overwhelming proof offered by the appellant.

 ██ As a substitute for reliable testimony, we cannot take judicial knowledge that the detonation of a fifteen pound charge of dynamite will cause damages to a water well located eight hundred feet therefrom, under the conditions as advanced in this record.

The principles in the Pittman case are controlling here. For these reasons, the judgment entered in this case is reversed and judgment entered here for the appellant.

Reversed and judgment entered for appellant.

*Kyle, P. J., and Rodgers, Jones and Patterson, JJ.,* concur.