743 So.2d 1029 (1999)
James D. GORDON, M.D., Appellant,
v.
Helen L. McDONALD, Appellee.
No. 97-CA-00787-COA.
Court of Appeals of Mississippi.
May 18, 1999.
*1030 Stephen P. Kruger, Stuart Bragg Harmon, Ridgeland, Attorneys for Appellant.
T. Mack Brabham, McComb, Attorney for Appellee.
EN BANC.
KING, P.J., for the Court:
¶ 1. This medical malpractice case comes to the Court from the Circuit Court of Hinds County, First Judicial District. The jury found that the appellee, Helen McDonald, did not give her informed consent to the appellant, Dr. Gordon, to perform an ethmoidectomy and awarded Ms. McDonald $225,000. Feeling aggrieved by the jury's verdict, Dr. Gordon appeals and assigns the following as error:
1. The trial court erred in charging the jury with an incorrect statement of the law on the issue of informed consent.
2. The trial court erred in allowing the jury to consider Mrs. McDonald's past and future immune deficiency treatment as an element of damages.
3. The trial court erred by denying Dr. Gordon's motion for judgment notwithstanding the verdict.
4. The trial court erred by denying Dr. Gordon's motion for new trial.
We affirm.

Facts
¶ 2. On September 2, 1992, Helen McDonald consulted Dr. Gordon, an ear, nose, and throat specialist, experiencing pain and congestion in her face.[1] Based on McDonald's physical examination and medical history, Dr. Gordon ordered a CT scan to determine whether her condition warranted surgery. After viewing the CT scan, Dr. Gordon recommended surgery.
¶ 3. On September 25, 1992, Helen McDonald underwent a bilateral endoscopic maxillary anstrostomy[2] ("BEMA").
¶ 4. Experiencing post-operative complaints, Ms. McDonald sought the advice of Dr. Flowers, an infectious disease specialist. On March 21, 1994, Ms. McDonald picked up her medical records from Dr. *1031 Gordon in order to deliver them to Dr. Flowers. It was at this time that Ms. McDonald allegedly learned for the first time that Dr. Gordon had performed a bilateral ethmoidectomy ("BEE").[3]

I. THE TRIAL COURT ERRED IN CHARGING THE JURY WITH AN INCORRECT STATEMENT OF THE LAW ON THE ISSUE OF INFORMED CONSENT.
¶ 5. Dr. Gordon argues that the trial court committed reversible error in allowing the jury to be given an incorrect instruction on the law. The instruction of which Dr. Gordon complained, P-9, read as follows:
The court instructs you that Helen McDonald's first claim against the defendant is that she never agreed or consented to the surgical procedure performed on her on September 25, 1993 known as a BEE (bilateral ethmoidectomy). Concerning this particular claim, the court instructs you that the law protects the right of each individual to be touched only when and in a way authorized by that individual. Every human being of adult years and sound mind has a right to determine what shall be done with his or her own body, and a surgeon who performs an operation without his patient's consent is liable in damages. A competent individual has a right to refuse to authorize a procedure, whether the refusal is grounded on doubt that the contemplated procedure will be successful, concern about probable risk or consequences, lack of confidence in the physician recommending the procedure, religious belief, or mere whim. Concisely stated in one sentence, no physician may perform any procedure on a patient no matter how slight or well intended without the patient's informed consent.
Therefore, if you find from a preponderance of the evidence that Helen McDonald did not consent to a surgical procedure known as a BEE and that such procedure was performed on her on September 25, 1993 without her consent, then the defendant is liable to Helen McDonald. Then if you further find from a preponderance of the evidence that such wrongful conduct by the defendant proximately caused or contributed to any injury or any damages to Helen McDonald, then it is your sworn duty to return a verdict in her favor and award damages pursuant to the other instructions of this court.
¶ 6. Gordon contends that the correct statement of the law was his instruction D-12, which was not given. The record reflects that both P-9 and D-12 were initially granted by the trial court. Prior to concluding the conference on instructions, the trial court expressed some concern about giving both P-9 and D-12. The trial judge indicated a need for time to research the issue prior to a final meeting. The parties suggested that it might be a matter which they could agree upon and thereby eliminate the necessity of that research.
¶ 7. The trial court had refused Dr. Gordon's instruction D-17 and D-18, both of which dealt with pre-existing conditions. After negotiation, the parties agreed that McDonald would not object to D-17, if certain amendments were made, or if Dr. Gordon withdrew D-12. The trial court then granted instructions consistent with the agreement of the parties.
¶ 8. Gordon contends that notwithstanding his agreement to withdraw his instruction on informed consent, D-12, he did not withdraw his objection to McDonald's instruction on informed consent, P-9. We find this argument to be, at best, disingenuous.
¶ 9. The parties entered negotiation after the court expressed concern about the conflict in the two informed consent instructions. The parties indicated to the court that they would attempt to reach an agreement on the issue rather than have *1032 the judge do further research prior to rendering a decision.
¶ 10. That agreement was reached and provided, in part, that Dr. Gordon would withdraw D-12, his instruction on informed consent. This would eliminate the conflict in instructions by leaving only P-9, McDonald's informed consent instruction.
¶ 11. Although the trial judge should instruct the jury sua sponte when instructions submitted by counsel are defective, Newell v. State, 308 So.2d 71, 78 (Miss.1975), there is no obligation on the trial judge to dissuade a party from voluntarily withdrawing a instruction previously admitted.
¶ 12. Therefore, assuming arguendo that Gordon's protestation that instruction P-9 incorrectly stated the law of informed consent is valid, Gordon's withdrawal of the informed consent instruction which he claims to have correctly stated the law was tantamount to a waiver of his earlier objection.
¶ 13. Because Gordon voluntarily withdrew the instruction which he now claims was a correct statement of the law, this assignment of error is without merit. It is well settled that the failure to object to an instruction or request an appropriate instruction operates as a waiver of that issue on appeal. Billiot v. State, 454 So.2d 445, 462 (Miss.1984). Dr. Gordon's decision to withdraw his already granted instruction D-12 removed the controversy from the trial courts consideration. Furthermore, "[a] trial judge will not be found in error on a matter not presented to him for decision." Jones v. State, 606 So.2d 1051, 1058 (Miss.1992).

II. THE TRIAL COURT ERRED BY ALLOWING THE JURY TO CONSIDER THE APPELLANT'S PAST AND FUTURE IMMUNE DEFICIENCY TREATMENT AS AN ELEMENT OF DAMAGES.
¶ 14. Dr. Gordon's next assignment of error addresses the issue of Ms. McDonald's past and future medical problems as elements of damages. Dr. Gordon contends that it was not established in terms of reasonable probability that Ms. McDonald would require immune deficiency treatment nor was it established through expert testimony that Ms. McDonald's immune deficiencies were a product of the removal of her ethmoids.
¶ 15. Dr. Gordon did not object to this instruction and is procedurally barred from raising this issue on appeal for the first time. Procedural bar notwithstanding, we find no merit in this.
¶ 16. It is patently clear from the testimony given by Dr. Austin that as a result of the BEE, Ms. McDonald would forever be what he termed a "nasal cripple". This opinion was corroborated by Dr. Lockey and Dr. Sneed, Dr. Gordon's own expert. This testimony entitled McDonald to a jury instruction regarding past and future medical treatment.

III. THE TRIAL COURT ERRED IN DENYING DR. GORDON'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
¶ 17. Dr. Gordon argues that it is overwhelmingly clear that Ms. McDonald consented to the BEE and that reasonable minds could not have differed and that the trial court erred in not granting his motion for judgment notwithstanding the verdict. We disagree.
¶ 18. The Mississippi Supreme Court in Royal Oil Co., Inc. v. Wells, defined an appellate court's review of a trial court's denial of a motion for judgment notwithstanding the verdict as follows.
Where, as here, the trial judge has refused to grant a motion for JNOV, we examine all of the evidencenot just evidence which supports the non-movant's casein the light most favorable to the party opposed to the motion. All credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn therefrom are accepted as true and redound to the *1033 benefit of the non-mover. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, the motion should be granted. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the jury verdict should be allowed to stand and the motion denied, and, if it has been so denied, we have no authority to reverse.
Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 442 (Miss.1986)
¶ 19. In the case at bar, there is substantial evidence in support of the jury's verdict. On the issue of informed consent, McDonald testified that she was not aware that on September 25, 1992, Dr. Gordon performed the BEE. Instead, McDonald testified that it was not until March 21, 1994, when she retrieved her medical records from Dr. Gordon's office, that she first became aware that a BEE had been done. In contradiction of McDonald's testimony, it was revealed during the course of the trial that, on at least three different occasions prior to March 21, 1994, Ms. McDonald indicated that she had undergone an ethmoidectomy or BEE.
¶ 20. Dr. Gordon testified that he explained to Ms. McDonald that her ethmoids were diseased and recommended that they be removed. However, Dr. Gordon's surgical notes showed that Ms. McDonald was scheduled for a BEMA only.
¶ 21. Similarly on the issue of damages, there existed a factual dispute as to whether Ms. McDonald's condition improved or deteriorated as a result of the surgery.
¶ 22. This clearly presented a factual dispute to be resolved by the jury. The jury resolved this dispute in favor of Ms. McDonald. On disputed matters of fact, this Court will not substitute its findings for those of the jury. Evans v. State, 159 Miss. 561, 566, 132 So. 563, 564 (1931).

IV. THE TRIAL COURT ERRED BY DENYING DR. GORDON'S MOTION FOR NEW TRIAL.
¶ 23. Dr. Gordon contends that the trial court committed reversible error in denying his motion for new trial. Dr. Gordon argues that the jury was improperly instructed on the law or the verdict was the product of the jury's own biases, passions, or prejudices.
¶ 24. A motion for a new trial challenges the weight of the evidence. Henson v. Roberts, 679 So.2d 1041, 1045 (Miss.1996). The grant or denial of a motion for a new trial is a matter within the sound discretion of the trial judge. May v. State, 460 So.2d 778, 781 (Miss.1984). The credible evidence of the case must be viewed in the light most favorable to the non-moving party. Clark v. Columbus & Greenville Ry. Co., et al., 473 So.2d 947, 950 (Miss.1985).
¶ 25. When the evidence is viewed as such, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion. Moody v. RPM Pizza, Inc., 659 So.2d 877, 881 (Miss. 1995).
¶ 26. Sufficient evidence was submitted to the jury from which it could reasonably find for Ms. McDonald. As stated supra, McDonald testified that she did not give her consent for Dr. Gordon to perform the BEE. Dr. Gordon cited at least three separate instances whereby Ms. McDonald indicated knowledge that she had undergone a BEE. These facts presented by Dr. Gordon merely raised a question of fact to be resolved by the jurors. The jury resolved that question of fact against Dr. Gordon, and this Court will not substitute its opinion for that of the jury. The trial court *1034 did not err in refusing Dr. Gordon's motion for new trial.
¶ 27. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL AND A FIFTEEN PERCENT STATUTORY PENALTY AND INTEREST ARE ASSESSED TO THE APPELLANT.
BRIDGES, COLEMAN, DIAZ, IRVING, AND THOMAS, JJ., CONCUR.
McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., LEE AND PAYNE, JJ., NOT PARTICIPATING.
McMILLIN, C.J., dissenting:
¶ 28. I would reverse and remand for a new trial solely on the issue of damages. I would do that based on the trial court's decision to permit the jury, over a defense objection, to consider some $19,000 in intravenous immunoglobulin treatments received by McDonald as a proper element of damages. In my view, there was no evidence to support the proposition that these treatments were attributable to a condition caused by the unconsented-to surgery. Insofar as the record reveals, these treatments were nothing more than one of many medical procedures tried by various treating physicians to alleviate McDonald's recurring complaints of sinusitis that began over a decade before the surgery.
¶ 29. I fear that the trial court, and now the majority of this Court, have fallen into the logical fallacy concerning causation that is expressed by the Latin phrase, post hoc, ergo propter hoc, which is to say that proof that one event followed another does not establish that the prior event caused the latter. In Western Geophysical Co. of America v. Martin, the Mississippi Supreme Court said,
In conclusion, this Court can neither ignore the time-honored maxim that a party seeking redress must show a causal connection between the wrongful act of the accused and the injury alleged to have been sustained, nor accept as proof the assumption post hoc ergo propter hoc made by the appellee....
Western Geophysical Co. of America v. Martin, 253 Miss. 14, 174 So.2d 706, 716 (1965). The mere fact that the immunoglobulin treatments temporally followed McDonald's surgery does not establish with the requisite certainty that the necessity for those treatments arose because of the surgery.
¶ 30. It must be remembered that the jury resolved the issue of Gordon's negligence in performing the surgery against McDonald and confined its verdict solely to concluding that Gordon failed to properly gain McDonald's prior consent to the procedure. Thus, McDonald's right of recovery is limited to those damages shown by a preponderance of the evidence to have arisen solely from the battery that occurred when Gordon exceeded the scope of his authority while operating. The Mississippi Supreme Court, in explaining the concept in Phillips v. Hull, quoted with approval from a treatise on hospital law to the effect that:
[t]he foundation for the consent requirement applicable to medical practitioners is the tort law of assault and battery the legal doctrine protecting the right of each individual to be touched only when and in the way authorized by that individual.
Phillips v. Hull, 516 So.2d 488, 492 (Miss. 1987) (quoting P. Lasky, Consent to Medical and Surgical Procedures, in 11B HOSPITAL LAW MANUAL 1 (1986)). Later in that same decision, the supreme court emphasized that a verdict based solely upon a lack of implied consent must be subjected to normal tort law analysis to determine that there was "duty, breach, causation and damage." Id. (emphasis supplied).
¶ 31. Exactly what the proper elements of damage caused solely by the battery of an unwanted touchingand not by any *1035 consideration that the procedure itself was negligently performedis a matter to be addressed on remand, but, on the present record, it is evident that those damages do not include the costs of a costly alternative medical treatment undertaken in an attempt to alleviate a medical condition that substantially predated the ethmoid surgery. Dr. Flowers, who prescribed the treatment, did not even testify at trial. His medical records introduced into evidence say only that "if [McDonald] continues to have problems with chronic recurrent bacterial sinusitis, I think we should consider intravenous immunoglobulin therapy." This does not, of itself, suggest that any chronic sinusitis was a condition attributable to the ethmoid surgery. In fact, Dr. Flowers's later clinical notes indicate that, after the long course of treatment, he was not persuaded that McDonald's complaints were related to sinusitis at all, but might even be attributable to chronic fatigue syndrome. In all events, the medical records in this case demonstrate overwhelmingly that McDonald had complained of and been treated for sinus problems for years prior to her surgery. The symptoms Dr. Flowers sought to treat could not, by any construction of the evidence, be traced to McDonald's ethmoid surgery. Only the feeblest attempt was made to tie these immunoglobulin treatments to the surgery through the testimony of a competent witness at trial. Plaintiff's expert witness, Dr. Austin could only offer an opinion that, based on his review of Dr. Flowers's records, "[McDonald] seemed to be a lot better after the immunoglobulin...." The mere fact that the treatment may have benefitted McDonald's years-long sinus complaints does nothing to suggest that the sinus complaints themselves were attributable to the ethmoid surgical procedure performed by Dr. Gordon.
¶ 32. One court writing on the subject of the proper measure of damages in a case where the only offense was the battery of an unconsented-to procedure suggested that damages might include "injury ... to plaintiff's personal dignity and right of privacy...." since the primary concern "is vindication of [a] valuable, although intangible, right, the mere invasion of which constitutes harm...." Lugenbuhl v. Bowling, 701 So.2d 447, 455-56 (La.1997). Another Louisiana case dealt with a situation where the plaintiff had been subjected to a hysterectomy without her advance consent. Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 444 So.2d 143, 143 (La.Ct.App. 1983). After it was determined that the surgeon was not negligent in performing the procedure, the court considered what damages would flow based strictly on the battery. Id. In substantially limiting the scope of damages, the court said:
Since we find from a preponderance of the evidence that the patient was already sterile, we decline to award damages for the removal of the ability to bear children. Ms. Wilson, however, is due damages for the battery, the removal of her organs without her consent, for the shock of the disclosure to her that her organs had been removed, and for the increment in pain, length of recovery and such elements resulting from the operation performed beyond the laparotomy to which she had consented and which she expected.
Id. at 143-44.
¶ 33. Dr. Austin's rather dramatic description of McDonald as a "nasal cripple," on further examination, seems to indicate primarily that McDonald will be required to artificially irrigate her sinus cavities on a regular basis throughout the remainder of her life. Whether that bleak prospect was a proper consideration in assessing damages is one thing. However, to say that it supports the notion that the evidence concerning the immunoglobulin treatments was properly admitted is simply not a sustainable position.
¶ 34. I would reverse and remand for a trial solely on damages where the proof was limited to those actual damages that the evidence showed to be proximately *1036 caused by the unapproved surgical procedure. This would have the effect of excluding evidence of the costs of subsequent medical expenses that were traceable to nothing more than continuing efforts to address McDonald's persistent medical complaints that substantially predated the surgery.
SOUTHWICK, P.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Dr. Gordon had treated McDonald for a similar complaint in 1983. Dr. James Gordon performed a procedure on McDonald to create nasoantral windows. This surgery was performed after McDonald visited Gordon's office with complaints of congestion of the ears and nasal passages.
[2] This procedure is performed to increase the drainage of sinuses.
[3] This procedure involves the removal of diseased ethmoid cells.