WARREN PETROLEUM CORPORA-
TION, Appellant,

v.

J. M. LEE and Hattie P. Lee,
Appellees.

No. 15950.

United States Court of Appeals
Fifth Circuit.

June 8, 1956.

M. D. Wallingford, Warren M. Sparks, Tulsa, Okl., C. W. Sullivan, Hattiesburg, Miss., for appellant.

Alfred Moore, Hattiesburg, Miss., for appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an action brought by two riparian owners for damages resulting from the pollution of the stream running through their pasture, allegedly destroying their fishing rights in the stream, causing salt marsh mosquitoes to breed and annoy the plaintiffs and their stock, and resulting in illness and death to some of the plaintiffs' cattle which drank from the stream. The jury returned a verdict for the plaintiffs in the amount of $3500, from which the defendant appeals on the grounds that there is insufficient evidence of a causal connection between the pollution of the stream and the alleged damages, and that the recovery allowed is both speculative and excessive.

The plaintiffs' evidence tended to show that they bought the property in question on December 31, 1949, and moved onto it during January, 1950. It consisted of about 28 acres, on which there was a house and an auction sales barn, where cattle sales had been held for the preceding fifteen years. The plaintiffs repaired the house, built a new auction ring, bought a set of scales, and built fences separating the property into two pastures. One of the pastures was 2½ acres in area, and was located directly behind the barn; the other was about 22 acres in area. Green's Creek runs through the larger pasture, separating it into areas of 10 and 12 acres. From the time that they moved onto the property, in January, 1950, until they sold it, in November, 1953, the plaintiffs held livestock auctions there every Tuesday. If there were cattle left after a sale, or if the plaintiffs bought any cattle during the week for sale on the following Tuesday, the stock were set loose in the larger pasture, where the grazing was sufficient to maintain them for sale.

In 1951 the Warren Petroleum Co. bought land about two miles upstream from the plaintiffs' property, and in the fall of that year and in the spring of 1952 it began operations to prepare the property for use in the underground storage of liquified petroleum gas, sometimes referred to as propane or butane.

The operation consisted of, first, drilling three wells on the land and into an underlying salt dome, and second, pumping water from Leaf River into the wells, creating cavities in the salt dome where the gas was to be stored. The water removed from the three wells, aggregating fourteen million gallons, was stored in three earthen pits. This water had a salt concentration of 18% to 23%, more frequently expressed as 180,000 to 230,000 parts of salt per million gallons of water.

At a time before April, 1952, some of this impounded water began to seep into Green's Creek. During this month, and throughout May and June, as well, the water in Green's Creek below the Warren property became noticeably salty. In addition, dead fish were found on the creek banks. In July, 1952, the Forrest County Health Department investigated complaints regarding mosquitoes in the area, and found salt marsh mosquitoes breeding in Green's Creek and found they were very numerous in the vicinity. All of these conditions were new, Green's Creek having theretofore been a lively, fresh stream, and salt marsh mosquitoes never before having been encountered in the area.

The livestock which drank from the creek waters were also affected. A witness who kept a hog pen on the creek between the Warren Petroleum Co. property and the plaintiffs' property lost 30 hogs and 18 pigs from an illness which bloated their stomachs and caused them to have diarrhea. The waste material looked like brine. The plaintiffs' cattle suffered from a similar disorder, other symptoms being loss of appetite, stiffness of limbs, a staggering gait, and apparent blindness. From week to week the plaintiffs had 35 or 40 cattle sick. They tried to doctor them, until so many became ill that the plaintiffs finally sold them at auction, notwithstanding the fact that they were underweight. Twenty-five head of cattle died from this illness, and 25 or 30 more were sold at half of what they cost. During the summer of 1952 the plaintiffs took their cattle out of the larger pasture and kept them in the pasture behind the barn, buying feed throughout this period for an average of 25 head, at a cost of 50 cents to 75 cents a day per head. This continued until the property was sold in November, 1953.

Chemical analyses of Green's Creek showed that the concentration of salt to water was 2040 parts of salt per million gallons of water in May, 1952, and 3950 parts of salt per million gallons of water in August, 1952. Analyses of water taken from the creek in January and March, 1953, showed concentration of 280, 1850, and 71,688 parts of salt per million gallons of water. The regulations of the Mississippi Game and Fish Commission forbid increasing the salt concentration of state waters beyond 1000 parts per million gallons of water.[1]

The defendant offered evidence that a cow could consume up to two pounds of salt a day without ill effects. Its experts also testified that a cow could drink only 25 to 30 gallons of water a day, so that at the concentration shown in May ar 1 August of 1952, a cow drinking from the creek would consume less than two pounds of salt a day. Thus, at a concentration of 2040 parts of salt per million gallons of water, a cow drinking 30 gallons of water would consume less than a half pound of salt. However, if the concentration was as great as that indicated by one of the March, 1953, samples, or as great as that indicated by the average of all the samples of water taken from Green's Creek, a cow drinking 30 gallons of water would consume more than two pounds of salt.[2]

---

1. Regulation 4(c) states: "The increased salt concentration shall not exceed one thousand (1000) parts per million of sodium chloride."

2. At a concentration of 71,688 parts per million, a cow drinking 30 gallons of water would consume 17.7 pounds of salt. At a concentration of 15,962 parts per million, which is the average of the samples taken from Green's Creek, a cow drinking 30 gallons of water would consume 3.9 pounds of salt.

The defendant also offered evidence that a cattle disease called scours, having symptoms similar to those of the plaintiffs' cattle, was prevalent in the area during the spring of 1952. This disorder is caused by eating too much green grass in the spring, internal parasites, shipping fever, or eating moldy hay or moldy feed. Veterinarian witnesses testified that the only satisfactory way to determine whether the cause of death under such circumstances is scours or salt poisoning is by examination of the dead cow's stomach. They also testified that the fact that the evacuated material looked like salt would not be determinative of the cause of death, since such appearances may be deceiving.

In addition, the defendant proved that between its property and the plaintiffs' land there was a hog pen, a poultry slaughter pen, a slaughterhouse where mules and horses were cut up for dog food, and two other slaughter pens. The plaintiff offered evidence that the last two named enterprises were not operating in the spring of 1952, and that refuse from the dog food slaughterhouse drained to a cesspool not leading to the creek. However, during the period in question the poultry concern piled feathers and other waste on its property, from which drainage led to the creek.

There was expert testimony that a cow will drink fresh water if it is available, and testimony by the previous owner that there was a pond in the small pasture on the plaintiffs' land, running water from a well which could be pumped to the barn, and a cattle path down to Leaf River, which fronted on the plaintiffs' land for about 100 feet. On the other hand, the plaintiffs' witnesses testified that they actually saw the cattle drinking from the creek while it was polluted, that the pond was only a mud-hole and not a year-around water place, that the cattle often refused to drink out of a trough, and that if Leaf River crossed the plaintiffs' land, that fact is unknown to them.

The defendant urges most earnestly that even resolving all of these conflicts in the evidence in the plaintiffs' favor, the finding that there was a causal connection between the seepage of salt water from its property into the creek and the sickness and death of the plaintiffs' cattle could only be reached by conjecture and surmise on the part of the jury, and therefore cannot be allowed to stand. Masonite Corporation v. Hill, 170 Miss. 158, 154 So. 295, 95 A.L.R. 157; Smith v. General Motors Corporation, 5 Cir., 227 F.2d 210. Thus, it calls attention to uncontradicted veterinarian testimony that the cause of death could not be ascertained from the symptoms described by the plaintiffs' witnesses, but only through examination of the affected cow's stomach. Moreover, the Mississippi courts have held that where medical testimony is undisputed on a subject beyond the range of the common experience and observation of jurors, it must be accepted and acted upon by them like any other undisputed evidence. Kramer Service, Inc. v. Wilkins, 184 Miss. 483, 186 So. 625.

Were the evidence of salt poisoning limited to the symptoms described by the plaintiffs' witnesses and repeated to the veterinarian witnesses in the form of questions, we would be constrained to agree with the defendant. However, the theory of salt poisoning only begins here, as a *possible* cause of illness and death according to the science of veterinary medicine, and is strengthened by other evidence in the case to the point where it becomes a probability, rather than a mere surmise. And, of course, if under all the evidence adduced below salt poisoning was shown to be a probable cause of the disorder affecting the plaintiffs' stock, and it was likewise demonstrated that the defendant's pollution of the creek was the probable source of the salt, then the jury was warranted in finding a causal connection between the seepage of salt water into the creek and the subsequent illness of the plaintiffs' cattle.

According to the plaintiffs' testimony, they rarely had a sick cow before Green's Creek was polluted with salt; after its pollution 35 or 40 became ill. There was a marked improvement in the cattle, however, after they were penned in the small pasture, except when one would get down to the creek as a result of someone's oversight in leaving the gate open. In such a case the cow which escaped might become ill.

This evidence would tend to establish some connection between the disorder suffered by the plaintiffs' stock and the grazing or drinking water in the large pasture. The defendant's evidence that scours, a disease with symptoms like those of salt poisoning, is caused by eating too much green grass, might prevent one from assuming immediately that the source of the illness lay with the creek water and not with the grazing. However, there is the further evidence of a very similar disorder affecting M. G. Burns' hogs, who were penned upstream and likewise drank from the creek. It was not shown that hogs are subject to a disorder like that of scours, and yet the disease suffered by them was very like that affecting the plaintiffs' stock, and serious enough to cause the deaths of 30 hogs and 18 pigs. The presence of dead fish on the creek banks furnishes further evidence of a foreign and harmful element in the water. This is also borne out by the testimony of a witness who stated that he became sick from drinking creek water at about this time, which he had drunk previously with no ill effects. Finally, there was testimony that several cows who were observed drinking from the creek were discovered later lying near the creek and unable to walk. Eventually these cows died.

The defendant contends that this evidence, which appears sufficient to support an inference that there was a causal connection between the disorder suffered by the plaintiff's stock and their drinking of creek water, is nevertheless insufficient to allow the further inference that the harmful element in the creek water was the salt. It urges that contrary to the plaintiffs' testimony that the creek was fresh and live, it was in fact polluted by the refuse from four slaughter pens and a hog pen. However, the plaintiffs' evidence showed clearly that two of these slaughter pens were not operating in the spring of 1952, and there was other testimony that the refuse from the dog food slaughterhouse went to a cesspool not leading to the creek. Moreover, the hog pen and the poultry slaughter pen, while they were operating in the spring of 1952, had also been operating before then, and the degree in which they had polluted the creek, which was never shown with any certainty by either party, had not been sufficient to harm the plaintiffs' cattle. Since the more likely cause of illness would seem to be the source of pollution contemporaneous with the illness, the salt appears as the stronger possibility. Moreover, Burns' hogs, which were upstream from the poultry slaughter pen, were not subject to this particular source of pollution, and yet they suffered from the same disorder as the plaintiffs' cattle. Thus it would seem fairly inferable that since the hogs were upstream from all the slaughter houses, and had the same disease as the cattle, the intervening pollution, if any, was not the cause of the cattle's disorder.

The defendant contends that all of this circumstantial evidence, which taken together indicates that its operation is the most likely source of the damage to the livestock, is contradicted by the positive scientific evidence that there was not enough salt in the stream in May or August, 1952, to harm a cow. This argument excludes the January and March, 1953, samples as too distant in time from the damages complained of to be relevant, and assumes the conclusiveness of the two earlier analyses. However, the March, 1953, analysis, which included samples from other streams below the Warren property as well, showed that at any given time the concentration of salt

in these streams was likely to be very uneven. The more complete data under such circumstances would seem to be the more representative and under an average of all the samples taken from Green's Creek, the jury could find that the salt dosage in the water was lethal to cattle.[3]

■ These tests provide the last link in the chain of circumstantial evidence connecting the seepage from the impounded salt water on the defendant's property to the illness and death of the plaintiffs' livestock. The defendant argues, however, that even assuming the sufficiency of this evidence, the judgment cannot stand because the damages assessed were based on indefinite proof of actual monetary loss, and are so large as to indicate passion or prejudice on the part of the jury. To the contrary, the verdict is amply supported by the evidence. The evidence shows that from the summer of 1952 until November, 1953, while the plaintiffs' cattle were penned in the small pasture, the plaintiffs expended 50 cents to 75 cents a day per head for feed, and that the number of cattle penned there averaged 25 head.[4] This would total a minimum outlay in excess of $5000 alone, exclusive of all loss suffered as a result of cattle dying or being sold for half price because of their underweight condition. Under such a state of facts, the award of $3500 damages was fully warranted.

The judgment is

Affirmed.

3. See note 2, supra. In addition, several of the witnesses compared the taste of the creek water after April, 1952, to the taste of water from the Gulf of Mexico. A chemist testified that the concentration in the Gulf was between 11,000 and 18,000 parts per million, and a veterinarian testified that it was between 20,000 and 30,000 parts per million. These are more in accordance with the 24,606 average of the samples taken in January and March, 1953, than with the earlier single samples. This comparison of the condition of the stream in 1952 with its condition in 1953 makes the 1953 tests relevant to the inquiry as to the content during the critical period in the summer of 1952. Moreover, the veterinarian stated on cross-examination that a cow could not drink Gulf water and not get sick.

4. On the liability of one who pollutes a stream for the expense incurred by a riparian owner in moving his cattle to other pastures, see Southland Co. v. Aaron, 221 Miss. 59, 72 So.2d 461 and Southland Co. v. McDonald, Miss., 82 So. 2d 448.