# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-01164-SCT

*JEAN S. HARDIN*

*v.*

*TOWN OF LEAKESVILLE, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2020 |
| TRIAL JUDGE: | HON. STEPHEN B. SIMPSON |
| TRIAL COURT ATTORNEYS: | A. MALCOLM N. MURPHY |
| | L. GRANT BENNETT, SR. |
| | SAM STARNES THOMAS |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | A. MALCOLM N. MURPHY |
| ATTORNEY FOR APPELLEE: | L. GRANT BENNETT, SR. |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 06/09/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Jean Hardin appeals from the Greene County Circuit Court's grant of summary judgment in favor of Town of Leakesville on her claim that Leakesville negligently failed to maintain its drainage ditches around her home, resulting in personal and property damages. We agree that Hardin failed to present sufficient evidence that the water accumulated underneath her house was caused by any act or omission attributable to Leakesville; accordingly, we affirm the trial court's grant of summary judgment in favor of Leakesville.

## FACTS AND PROCEDURAL HISTORY

¶2.    Hardin sued Leakesville in September 2015 claiming the town "wrongfully filled/closed" existing drainage ditches near her home located at 1817 Center Street, causing water to seep into the crawlspace underneath her home during heavy rains, and resulting "in mold/rot damage to her home." According to the complaint, Hardin initially "believed the flooding problem commenced sometime between the year 1995/2000 but later learned the problem commenced shortly after the city passed an ordinance closing a street on July 6, 1993." She claimed that her "damages are solely caused by the water not being properly drained away from her home." Attached to the complaint were the minutes of a town board meeting held on July 6, 1993.

¶3.    Leakesville responded denying any negligence on its part and denying that the minutes from the July 6 board meeting contained any ordinance closing a street.

¶4.    After the close of discovery, Leakesville filed a motion to strike Hardin's designated experts, along with a motion for summary judgment asserting that Hardin could not establish proximate cause and damages attributable to Leakesville. Following a hearing, the trial court granted both motions, concluding that Hardin provided no competent summary judgment evidence that the water underneath her house was caused by any act or omission attributable to Leakesville.

¶5.    Specifically, the trial court held that because neither Hardin nor her witnesses ever observed water seep or flow into the crawlspace, the claim would require specialized

2

knowledge within the scope of Rule 702 of the Mississippi Rules of Evidence to establish proximate cause. Having granted Leakesville's motion to strike Hardin's designated experts on **Daubert**[1] grounds, the trial court found that Hardin's deposition testimony and the deposition testimonies from her witnesses was insufficient to prove causation. The trial court further found that the sworn affidavit of Leakesville's expert, Jason Grover, had provided that the water accumulated underneath Hardin's house was not caused by any acts or omissions by Leakesville.

¶6.     The evidence presented in support of Hardin's causation claim includes a photograph showing rainwater in a ditch located on the southside of Hardin's property, along with a photograph showing standing water in the yards of two of Hardin's neighbors, Nell Grey and Don O'Neal. Hardin's property fronts Center Street, and Grey's and O'Neal's properties front Grand Avenue, which intersects Center Street to the north of Hardin's location; Grand Avenue runs east and west, and Center Street runs north and south. Hardin's property sits directly south of Grey's property and southeast of O'Neal's property, and it fronts Center Street.

¶7.     Three photographs were also submitted that show some standing water inside the crawlspace underneath Hardin's house. The causation evidence also consists of Hardin's

---

[1] **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579, 592-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (providing a nonexhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony). This Court adopted the **Daubert** standard for purposes of Rule 702 in **Mississippi Transportation Commission v. McLemore**, 863 So. 2d 31, 39 (Miss. 2003).

testimony and testimony from Eldridge Arnold and Charlie Martin, both of whom Hardin designated as expert and fact witnesses in the case.

¶8.     Hardin stated in her deposition that she did not know when water began to accumulate underneath her house. She never saw any water intrude into the crawlspace. She said Martin was the one who first told her that the water was coming from the ditch near her property. She could not recall exactly when Martin told her but said it was probably in 2014 or 2015. Hardin said she believed the seepage was due to a lack of adequate drainage from the ditches around her property. Hardin said that when her adult children (who were in their forties at the time of Hardin's deposition) were young, they frequently played in the yard around the house and that there was never a problem with standing water in the yard during that time.

¶9.     Hardin said the ditch south of her property used to be deeper and ran the whole length of the alley west of her property. Then Leakesville "came in and filled it up with sand and dirt or whatever so . . . my neighbors behind me could drive in the back . . . through that alley instead of his front yard." Hardin said, "Although that's alley, that's all town property. But they did stop at my line, and I think that's when it started."

¶10.    Attached to Hardin's complaint were the minutes from a board meeting held by Leakesville's mayor and alderman on July 6, 1993, which contains the following:

> The next item on the agenda was the request form Mr. Melrose O'Neal, a resident of Leakesville residing on Grand Avenue. At a prior meeting, Mr. O'Neal had requested that the alley behind his house, adjacent to Lackey Street, be cleaned of trees and debris in order for him to be able to get to the rear of his property. Superintendent Byrd was instructed to locate the alley and report back to this Board at this meeting. Superintendent Byrd informed the

4

> Town Board that the alley had been located and that the fence that the Church of Christ had put up is not in the alley. After a thorough discussion, a motion was made by Alderman Daniels and seconded by Alderman Bullard to open the part of the alley from west of Lackey Street to the backyard of Melroe O'Neal under the conditions that this alley be kept cleaned.

¶11. Martin testified that he is a licensed plumber. He briefly inspected the plumbing underneath Hardin's house on one occasion; he could not recall the date. He remembered seeing some standing water underneath the house and did not see any plumbing leaks. He could not say where the water originated from, and he could not rule out the possibility that it came from unknown plumbing issues in the past. Martin also could not remember whether it had recently rained when he inspected the plumbing. He recalled seeing a ditch on the south side of Hardin's property, but he could not recall whether he saw water in the ditch or which way the water would have flowed in the ditch.

¶12. When asked if he ever determined whether water actually seeped out from the ground underneath Hardin's house, Martin replied, "No." Martin added, "I mean, basically other than the water table. Water is holding here, it's going to find its level, so if it's not draining here, then it's going to be the same level over here. If that level is the same level under there, common sense tells you that it's leveled out." Martin said he never did any testing or performed a "perc test," to measure the soil's water absorption.

¶13. Arnold testified that he is a former section manager for Chevron in Pascagoula, Mississippi, having retired in 1998. He said that he has no formal engineering background and holds no special licenses or certificates dealing with plumbing, hydrology, and surveying.

5

Arnold is a friend of Hardin's and has been to Hardin's house several times. He said he has observed standing water around the property and underneath her house. On one occasion, he observed no standing water underneath the house, only mud.

¶14. Arnold took a number of measurements around Hardin's property and the perimeter of her home using a laser level tripod he had previously purchased from a hardware store. In his opinion, the standing water he observed underneath the house "came in from the bottom and seeped in" from the soil due to a high water table. Arnold said he reached this conclusion because when "looking down there when it was gully-washers coming, the water was not disturbed, so it had to be coming from underneath."

¶15. Arnold could not say how long the water he observed under the house had been there or exactly where it came from. But he believed the water flow originates from the "Dollar Store" located on the north side of Grand Avenue. Arnold said he observed heavy rain water falling from the Dollar Store's rooftop and flowing down the one acre lot behind the store, where some of the water then splits and crosses over Grand Avenue onto Grey's and O'Neal's properties.[2] Arnold did not say whether he actually observed water flow from Grey's and O'Neal's properties onto the northside of Hardin's property. He indicated, however, as follows: "What I saw from the pattern of the leaves - - the leaves and things is

---

[2] Center Street transects Grand Avenue to the north. Grey's and O'Neal's houses are located on Grand Avenue. According to Arnold's deposition, Hardin's property lies directly south of Grey's property and southeast of O'Neal's property.

the water comes in under the west end of the fence down about 10 or 15 feet and goes into the yard and cuts back and goes running back there. That would be my summation."

¶16. Arnold indicated that he never performed any soil test, and he did not know what the water level is for the type of soil on Hardin's property. Arnold said he did observe where someone had performed a "perc test" in Hardin's yard. He said there was a hole dug in the yard that had water in it. He did not know who dug the hole or whether anyone could have poured water into it. He said the yard was saturated with water at the time, so he assumed that was why water was in the hole.

¶17. Through Arnold's deposition testimony, Hardin submitted, over Leakesville's objection, a photograph of the south ditch taken by Hardin's attorney on January 23, 2019, at which time Arnold said he had been present, although Arnold could not remember the date. It depicts a small ditch running west-to-east, downhill from Hardin's house, and it shows water in the ditch, which Arnold indicated was from a recent rain. Hardin also submitted a photograph through Arnold's testimony and over Leakesville objection, taken the same day, January 23, 2019. It shows standing water in the front yards of Hardin's neighbors, Grey and O'Neal.

¶18. In its motion for summary judgment, Leakesville presented an affidavit from Grover, a civil engineer who had inspected Hardin's house and property on two occasions, December 3, 2013 and February 15, 2017. The affidavit was sworn on August 14, 2020, and included exhibits consisting of photographs and two reports authored by Grover in 2013 and 2018.

7

Both reports were prepared for Hardin's home-insurance provider, Mississippi Farm Bureau Insurance Company, which Hardin had sued in 2016 for denial of coverage.[3] The 2018 report reaffirmed the conclusions and opinions Grover provided in his 2013 report, "stated to reasonable degree of engineering probability."

¶19. Grover stated in his affidavit that he observed moisture and standing water in the crawlspace under Hardin's house, and he noted that there is no gutter system around the perimeter of Hardin's roof. Grover conducted a relative elevation survey on Hardin's rear, front and side yards which confirmed poor drainage conditions on her property. The ground surface of Hardin's property along the north and west side of her house was measured to slope down toward the house's crawlspace. Hardin's property around the house is relatively flat, and the crawlspace is positioned six to eight inches below the adjacent grade of her property. This allows rainwater to flow toward and accumulate in the crawlspace.

¶20. According to Grover, a large portion of the rest of Hardin's rear yard slopes downwards toward a drain inlet on the south side of her rear yard consisting of three four-inch PVC pipes inside the fence line on Hardin's property; the PVC pipes were mostly clogged. Grover noted there is a drainage ditch on the south side of Hardin's property that

_____

[3] Hardin sued Farm Bureau in a separate proceeding in 2016, claiming, inter alia, breach of contract arising from denial of coverage. *Miss. Farm Bureau Cas. Ins. Co. v. Hardin*, 323 So. 3d 1034, 1036 (Miss. 2021). Both cases proceeded in the Green County Circuit before different judges. While Hardin's case against Leakesville was proceeding, this Court reversed the other trial court's decision to deny Farm Bureau's motion for summary judgment based on our conclusion that Hardin's damages were not covered under the insurance policy. *Id.* at 1040.

runs in a west-to-east direction. There is an area near Hardin's PVC drain outlet that is lower than a portion of the ground surface of the south drainage ditch, which results in accumulated water in the area during rain events. Grover also noted a drainage ditch on the east side of Hardin's property that runs in a north-to-south direction. Grover said both ditches generally slope downwards for downhill draining. Grover noted that the east ditch has areas of undulated negative slope where water could accumulate during rain events. In his opinion, however, neither the south ditch or the east ditch is the contributing cause of water underneath Hardin's house.

¶21. Grover also noted poor ventilation in the crawlspace. There are no crawlspace vents on the north side of Hardin's house where he noted standing water. Of the eleven crawlspace vents Grover observed at other locations around the house, six were closed. Grover also observed a disconnected dryer exhaust vent into the crawlspace with evidence of discharge of clothes-dryer exhaust into the crawlspace. He observed water dripping from a rusted and deteriorated shower pan under the west bathroom into the crawlspace and water dripping from a deteriorated cast iron drain line beneath the west bathroom into the crawlspace.

¶22. Grover concluded that the crawlspace's poor ventilation, dryer exhaust discharge, leaks in the crawlspace (according to Grover, " to a lesser and limited extent"), and the poor site drainage on Hardin's property "contributed to and created ponded water, excessive moisture and a humid environment in the crawlspace[.]"

9

¶23. In response to Leakesville's motion for summary judgment, Hardin claimed that Grover's 2018 report was inconsistent with his 2013 report. The 2013 report had stated: "The poor drainage combined with the high ground water table and the crawlspace that was position[ed] lower than the exterior grade allowed water to flow into and accumulate in the crawlspace area." But in the 2018 report, Grover stated:

> Poor site drainage conditions were confirmed during second inspection by the relative elevation survey of portions of the yard. The ground surface at the north end of the west side of the building was measured to slope[] downwards towards the crawlspace areas, and the crawlspace was positioned 6 to 8 inches below the adjacent grade. *The noted conditions allowed the rainwater to flow towards and accumulate in the crawlspace areas as noted beneath the utility room during both of our inspections.*

¶24. Citing Arnold's deposition testimony, Hardin claimed in her summary judgment response that the water Grover was talking about comes across Grand Avenue into the yard of Hardin's neighbor on the north side of Hardin's property and then into Hardin's yard. Hardin indicated that this supported her theory that the water underneath house was the result of seepage water that came up from the saturated ground because the water underneath the house was clear water.

¶25. Hardin argued that Grover's report contained no evidence that Grover "conducted any scientific examination, dye test, seep test or proof of results of any elevation survey other than his visual inspection of the premise." And she claimed that Grover sought to modify his report and findings for Farm Bureau to fit a defense for Leakesville.

10

¶26. Hardin also took issue with the soil information Grover provided in his 2013 report which stated:

> The soils information available from the NRCS web soil survey indicated that the subject building was constructed on Savannah fine sandy loam soils. Savannah fine sandy loam soils were described as moderately well-drained soils with surface slopes of 0 percent to 2 percent and the water table was indicated to be located about 18 to 36 inches below the ground surface. Savannah fine sandy loam soils were rated as "somewhat limited" for the construction of residential structures due to the shallow depth to saturated soils and cemented pan.

¶27. Hardin argued that the fact that her house is built on "savannah fine sandy loam soil" has no bearing on the foundation of the house; it merely means that once too much water is permitted to stand or drain on the land after eighteen to thirty-six inches of accumulation, then the ground becomes saturated, and the crawlspace fills with water. Hardin maintained that the source of the seepage water was caused by standing water in the south ditch, "water impounded on Mr. Breland's land to the west of Hardin's land,"[4] and the excessive water from Grand Avenue. Hardin further maintained that her water problem did not exist until Leakesville permitted its ditches to be filled and failed to maintain its existing ditches.

¶28. On appeal, Hardin claims that the trial court was precluded from granting summary judgment because Leakesville did not address or contest Hardin's proof that water drained onto the north side of her property, nor did Leakesville address the blocked drainage on the west side of Hardin's land where the ditch was "silted in" on the west end of the south ditch.

---

[4] Based on our review of the record, this is the first and only mention of Mr. Breland's land.

11

¶29.   Hardin contends that Grover limited his observations only to the east and south ditches adjacent to Hardin's home, but he never addressed the water coming in from the north and west side of Hardin's yard.  Hardin further contends that Grover's opinion that rainwater accumulated in the crawl space at the northwest corner of Hardin's house coincides with her witness Arnold's deposition testimony that he saw water crossing Grand Avenue onto the yards of Grey and O'Neal.

¶30.   Hardin also claims that Grover's report constitutes a statement against interest that corroborates her proof that water flowed and accumulated under the house on the west and north sides.  She contends that Grover was the same expert for her home insurance provider, Mississippi Farm Bureau, which she previously had sued for denial of coverage concerning water damage to her home.  Hardin submits that Grover opined in that case that the ditches were the contributing cause of damage to her home.

## DISCUSSION

¶31.   This Court reviews a trial court's grant of summary judgment de novo.  *Travis v. Stewart*, 680 So. 2d 214, 217 (Miss. 1996).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Miss. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *McGinty v. Grand Casinos of Miss., Inc.-Biloxi*, 245 So. 3d 444, 447-48 (Miss. 2018) (citing Miss. R.

12

Civ. P. 56 (c)).  "To defeat a motion for summary judgment, the nonmoving party must make a showing sufficient to establish the existence of the elements essential to his case."  *Hust v. Forrest Gen. Hosp.*, 762 So. 2d 298, 300 (Miss. 2000) (citing Miss. R. Civ. P. 56 (c)). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made."  *Green v. Allendale Planting Co.*, 954 So. 2d 1032, 1037 (Miss. 2007) (internal quotation mark omitted) (quoting *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 483 (Miss. 2006)).

¶32.  In a negligence claim, the plaintiff bears the burden of establishing, by a preponderance of the evidence, the existence of the standard tort elements: "duty, breach, proximate causation, and damages."  *Simpson v. Boyd*, 880 So. 2d 1047, 1050 (Miss. 2004) (citing *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 794 (Miss. 1995)). Failure to present sufficient proof as to any one of these elements requires the claim be denied.  *Foster ex rel. Foster v. Bass*, 575 So. 2d 967, 972 (Miss. 1990).  On the issue of causation, the plaintiff must "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.  A mere possibility of such causation is not enough . . . ."  *Herrington v. Leaf River Forest Prods., Inc.*, 733 So. 2d 774, 777 (Miss. 1999) (quoting *Burnham v. Tabb*, 508 So. 2d 1072, 1074 (Miss. 1987)).

¶33.  A municipality has no duty to provide for or maintain a proper drainage system for surface waters.  *Hudson v. Yazoo City (In re Est. Of Hudson)*, 246 So. 3d 872, 877 (Miss.

13

2018) (citing Miss. Code Ann. § 21-19-13 (Rev. 2015)). But once it undertakes to either construct or maintain a drainage system, it assumes the responsibility to do so with reasonable care. *City of Pascagoula v. Rayburn*, 320 So. 2d 378, 381 (Miss. 1975).

¶34. Here, as mentioned, the trial court held that because neither Hardin nor her witnesses ever observed water seep or flow into the crawlspace, Hardin's claim would require specialized knowledge within the scope of Rule 702 to establish proximate cause in this instance. We agree.

¶35. Numerous Mississippi cases have dealt with flood damage claims from surface water visibly encroaching a dwelling. *Moses v. Rankin Cnty.*, 285 So. 3d 620 (Miss. 2019); *City of Jackson v. Internal Engine Parts Grp., Inc.*, 903 So. 2d 60, 62 (Miss. 2005); *Rayburn*, 320 So. 2d at 378; *City of Jackson v. Robertson*, 208 Miss. 422, 44 So. 2d 523 (1950); *Cain v. City of Jackson*, 169 Miss. 96, 152 So. 295 (1934); *City of Vicksburg v. Porterfield*, 164 Miss. 581, 145 So. 355 (1933). But we have been unable to find, and Hardin does not point to, a Mississippi case that squarely deals with alleged structural damage caused by water seeping up from the ground.

¶36. A somewhat similar case is *Bailey v. Wheatley Estates Corp.*, 829 So. 2d 1278 (Miss. Ct. App. 2002), which Leakesville cited in its summary judgment motion, and the trial court noted in its order granting the motion. In *Bailey*, the Court of Appeals affirmed the trial court's grant of summary judgment in favor of an upper landowner sued by a lower

14

landowner who claimed the defendant negligently allowed rainwater and raw sewage to run onto the plaintiff's property causing structural damage and health injury. *Id.* at 1279.

¶37.    In its motion for summary judgment, the defendant claimed the plaintiff had failed to produce experts necessary to show causation and damages. *Id.* at 1280. The defendant attached an engineering report stating that the structural damage was caused by fungus growth due to trapped moisture under the structure, which the engineer attributed to inadequate ventilation and water leaking from a bathroom faucet. *Id.* In response, the plaintiff attached a letter from another engineer stating that a preliminary investigation showed some damage to the house and that water did run off the defendant's property but that further tests and surveys were needed to link the damage to the defendant. *Id.* The trial court declined to rule on the summary judgment motion at that time and provided the plaintiff, who was proceeding pro se, additional time to file opposing affidavits. *Id.*

¶38.    The plaintiff originally had identified several expert witnesses, but none were properly designated as an expert, and the plaintiff never responded fully to discovery requests from the defendant for discovery. *Id.* When the parties appeared for trial, the trial court heard arguments on several motions and subsequently granted summary judgment in favor of the defendant based on plaintiff's failure to substantiate his claim. *Id.*

¶39.    The Court of Appeals affirmed, concluding that while there probably was water drainage from the defendant's land onto the plaintiff's, the plaintiff was unable to produce any evidence that the defendant diverted the water negligently. *Id.* at 1283. And while the

15

defendant admitted that a sewage backup had occurred, the plaintiff presented no evidence

that the backup was negligently caused by the defendant or that it caused any damages. *Id.*

¶40.    Hardin's case is wholly circumstantial as to her causation claim.  "[N]egligence may

be proved by circumstantial evidence where the circumstances are such as to remove the case

from the realm of conjecture and place it within the field of legitimate inference." *Kussman*

*v. V & G Welding Supply, Inc.*, 585 So. 2d 700, 703 (Miss. 1991) (citing *Cadillac Corp. v.*

*Moore*, 320 So. 2d 361, 366 (Miss. 1975)).  Proof of causation may be established by

circumstantial evidence, but "it must be sufficient to make plaintiff's asserted theory

reasonably probable, not merely possible, and more probable than any other theory based on

such evidence, and it is generally for the trier of fact to say whether circumstantial evidence

meets this test." *Miss. Valley Gas Co. v. Est. of Walker*, 725 So. 2d 139, 145-46 (Miss.

1998) (quoting 57 Am. Jur. *Negligence* § 461 (1989)), *overruled on other grounds by Adams*

*v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999).

¶41.    Further,

> while inferences of negligence may be drawn from circumstantial evidence, those inferences must be the only ones which reasonably could be drawn from the evidence presented, and if the circumstantial evidence presented lends itself equally to several conflicting inferences, the trier of fact is not permitted to select the inference it prefers, since to do so would be the equivalent of engaging in pure speculation about the facts. Where plaintiff in a negligence action has only presented proof that the actual cause was one of a number of possibilities, to enable an inference to be drawn that any particular cause is probable, the other causes must be eliminated. Thus, when the evidence shows that it is just as likely that accident might have occurred from causes other than defendant's negligence, the inference that his negligence was the proximate cause may not be drawn.

16

*Id.* at 145-46 (quoting 57A Am. Jur. 2d *Negligence* § 462 (1989)).

¶42.    This Court has also held that in a circumstantial evidence case, an inference may be based upon another inference.  ***Masonite Corp. v. Hill***, 170 Miss. 158, 154 So. 295, 297-98 (1934) (explaining that while a presumption may not be based upon another presumption, "it is not the unqualified rule that an inference may not be based upon another inference" when such "inferences [are] deduced from the facts").

¶43.    But in so holding, this Court cautioned that "we should do so no further than the reasonable necessities of the case, in the interest of justice, require."  ***Id.*** at 298.  And

> where a party, who has the burden of proof, has the power to produce evidence of a more explicit, direct, and satisfactory character than that which he does introduce and relies on, he must introduce [such] proof, or else suffer the presumption that, if the more satisfactory evidence had been given, it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case, which the more obscure and uncertain evidence did not disclose.

*Id.* (citations omitted).

> In other words, and to sum up what we have said, we shall allow in this jurisdiction the establishment of a case by inference upon inference so long as the ultimate inference, measured by legal standards, is, without too much doubt, a safe and dependable probability; but no such inference upon inference will be permitted to prevail when the fact sought to be established by such inference upon inference is capable of more satisfactory proof by direct, or positive or demonstrative, evidence, within the reasonable power of the party holding the burden to produce. In thus prescribing, we secure the administration of justice in a more dependable way, and at the same time reconcile our holding with the real weight of authority.

*Id.*

17

¶44. Hardin's theory of the case is that water accumulates underneath her house by seeping up from the ground due to a high water table, which Hardin posits is due to Leakesville's negligent failure to maintain the ditches around her property. The only evidence Hardin presented in support of her theory is testimonial evidence from her, Martin, and Arnold, along with a photograph of the south ditch showing standing water in the ditch and a photograph showing standing water in the front yards of two of her neighbors.

¶45. As the trial court found, this evidence fails to advance her case outside the realm of speculation and conjecture that the water observed underneath her house was due to Leakesville's negligence.

¶46. On appeal, Hardin presents almost no argument as to how her evidence affords a reasonable basis for the conclusion that water accumulating underneath house is the result Leakesville's negligence. She simply argues that if the allegations in her complaint are considered true, then Leakesville must show to a certainty that she "would be entitled to no relief under any set of facts." She cites **Crum v. City of Corinth**, 183 So. 3d 847 (Miss. 2016), for this standard. This, however, is the standard for Mississippi Rule of Civil Procedure 12(b)(6), not summary judgment under Rule 56. **Crum** involved a Rule 12(b)(6) motion.[5]

---

[5] Hardin also includes in her reply brief, a hand-drawn diagram "of the ditches and lack of ditches" around Hardin's property, which was not a part of the record evidence in this case. Leakesville has filed a motion to strike this portion of Hardin's reply brief, which we grant.

18

¶47. When the defendant moves for summary judgment asserting, by proper affidavits or other means, that there is no credible evidence to establish one or more of the essential elements of the plaintiff's claim, the plaintiff may not simply rely on pleadings to the contrary or on unsupported assertions that such proof exists. *MST, Inc. v. Miss. Chem. Corp.*, 610 So. 2d 299, 304 (Miss. 1992). Rather, the plaintiff must affirmatively demonstrate that the plaintiff possesses and will be able to present at trial admissible competent evidence that would support the plaintiff's cause of action. *Id.*

¶48. Hardin fails to do so. Instead, she attempts to bolster her case by claiming, on one hand, that Grover's reports corroborate her evidence and claiming, on the other hand, that his reports are conflicting and constitute a statement against interest. Neither is the case.

¶49. Grover's 2018 report reaffirmed the conclusions and opinions provided in his 2013 report. We see nothing contradictory or materially inconsistent between the two. Grover made no mention of the two ditches near Hardin's property in the 2013 the report, and there is no indication that he inspected those ditches during that site visit. Grover inspected both ditches during his second site visit for the 2018 report, and he concluded that they were not a contributing cause of water accumulating underneath Hardin's house.

¶50. Further, neither the 2013 report nor the 2018 report corroborates Arnold's testimony regarding the northwest corner of Hardin's property. The 2018 report stated that "the ground surface at the north end of the west side of the building was measured to slope[] downwards towards the crawlspace area, and the crawlspace was positioned 6 inches to 8 inches below

19

the adjacent grade." It concluded that these "noted conditions allowed rainwater to flow towards and accumulate in the crawlspace area as noted beneath the utility room during both our inspections." There is no indication in either report that Grover ever inspected O'Neal's and Grey's properties, nor did he inspect the Dollar Store's lot or parts of Grand Avenue.

¶51. This Court noted both of Grover's reports in **Hardin**, 323 So. 3d at 1036-37.[6] The opinion states that Grover's 2013 report "concluded that the damage to Hardin's home was caused by 'long term deterioration of the subfloor and floor framing' of the home because of the 'repeated and long-term exposure to moisture and damp conditions in the crawlspace area due to poor ventilation of the crawlspace, poor site drainage, and the discharge of dryer exhaust into the crawlspace area.'" **Id.** at 1036-37. In his 2018 report, Grover again "opined that the 'deterioration of the floor components was consistent with conditions caused by long-term and repeated exposure to moisture in the crawlspace area.'" **Id.** at 1037. Grover "also reported on the elevation survey, noting that the elevation 'allowed rainwater to flow towards and accumulate in the crawlspace.'" **Id.**

¶52. That is the only mention of Grover's reports in that case, and there is no suggestion at all from this Court that those reports indicated that Leakesville was responsible for the water damage to Hardin's home. That suggestion came from Hardin's deposition testimony

---

[6] Along with its motion to strike the portion of Hardin's reply brief containing a hand-drawn diagram, Leakesville also requests that this Court strike the portion of Hardin's appellate brief that references this Court's decision in **Hardin**, 323 So. 3d 1034, because it concerns information outside of this appeal. We deny Leakesville's motion to strike this portion of Hardin's brief.

20

in that case. "Hardin admitted in her deposition that the damage was caused by the Town of Leakesville's failure to maintain a ditch." *Id.* at 1040. This Court found that Hardin's own assertion "proves that the damage [claim] falls under . . . the policy's broad water-damage exclusion." *Id.*

¶53. Leakesville was not a party to that case. And Leakesville argues on appeal that its deposition of Hardin in this case revealed that she had no proof that Leakesville was the proximate cause of the damages to her house. We agree with Leakesville.

## CONCLUSION

¶54. We affirm the trial court's grant of summary judgment in favor of Leakesville.

¶55. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**

21